UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Western Division

TERESA M. WASHINGTON, )
    Plaintiff; )
     )
-vs.- ) No. CV-95-P-1679-W
     )
JIM WALTER RESOURCES, INC., )
    Defendant. )
     )

## Opinion

JUL 3 1 1998

Defendants' Motion for Summary Judgment was submitted at the court's August 9, 1996 motion docket. Defendants' Second Motion for Summary Judgment was submitted at the court's October 24, 1997 motion docket. For the reasons stated below, defendants' summary judgment motions are due to be GRANTED.

### Statement of Facts[1]

This action arises out of plaintiff Teresa Washington's ("Washington") employment as an accountant with the defendant, Jim Walter Resources, Inc. ("JWR").

After obtaining a bachelor's degree in accounting from the University of Alabama and working for a period of several months as a temporary property accountant for JWR, Washington was hired by JWR in October 1987 as a Property Accountant (grade 2),[2] at a monthly salary of

---

    1. The recitation of "facts" is based upon the materials submitted viewed in the light most favorable to the plaintiff.

    2. JWR employs a job grading system. The company assigns a grade to each position, based upon the duties and responsibilities of that position. The higher the job grade, the greater the duties, responsibilities and compensation.

$1650. Her immediate supervisor was Phil Tingle.[3]

In determining the starting salary for a new employee, JWR uses salary ranges that are based upon average salaries in the Southeastern United States. These salary ranges are used as guidelines in determining competitive salaries based upon a candidate's education, relevant experience, and the job market. The salary range for a particular job may increase from one year to the next. The supervisor to whom the new employee will report is responsible for recommending a starting salary. Depending upon the job market, JWR often hires applicants at a salary that is below the "minimum" of the applicable range. Washington's starting salary of $1650 was, in 1987, $195 below the minimum of the applicable salary range.[4]

JWR's fiscal year runs from June 1 through May 31. Budgeting for the upcoming fiscal year is done in January or February for the upcoming fiscal year, and raises and promotions are typically planned during the budgeting process and take effect at the beginning of the next fiscal year. An employee's immediate supervisor is responsible for recommending raises. Although

---

3. This reporting relationship changed in August 1990, when JWR restructured the Accounting Department. Tingle was demoted to Property Accountant, and Washington began to report to Ed McKnight. During a 1992 reduction in force, Washington was retained and Tingle was laid off.

4. A number of other JWR accounting employees have been hired at starting salaries below the minimum of the applicable salary range. Brian Pitts, a JWR Cost Accountant from September 1994 to May 1996, was hired at a salary $390 below the minimum. Janet Sanders, a JWR General Accountant II from August 1987 to February 1988, was hired at a salary $39 below the minimum. Kelley Lehman, who was promoted to the position of JWR General Accountant in June 1985, started her new position at a salary $255 below the minimum; when she was again promoted, in April 1987, to General Accountant II, her new salary was set at $282 below the minimum. Patti Johnson, who was promoted to the position of JWR Property Accountant in June 1994, started her new position at a salary $417 below the minimum. Carol Calhoun, a JWR General Accountant, was hired at a salary $345 below the minimum. Susan Watkins, a JWR Cost Accountant from September 1992 to August 1994, was hired at a starting salary $395 below the minimum. Maria Nelson, a JWR Cost Accountant from October 1990 to August 1992, was hired at a starting salary $200 below the minimum. Gayla Holman, who was hired by JWR as an Accountant in September 1989, started at a salary equal to the minimum of her salary range, having had several years of accounting work experience as an assistant controller at another company. All eight of these current or former employees are white.

2

most JWR employees receive raises once per year, any employee whose compensation is below the minimum of the applicable range may be considered for an additional raise after six months.

Between her hiring in October 1987 and the filing of her EEOC charge in February 1994, Washington received 8 raises. In February 1988, she received a raise of 5.1%, to $1735 per month. In August 1988, she received a raise of 4.59%, to $1815 per month. In March 1989, she received a raise of 4.68%, to $1900 per month. In April 1990, she received a raise of 2.52%, to $1948 per month. In July 1991, she received a raise of 4%, to $2026 per month. In January 1992, she received a raise of 4%, to $2107 per month. In June 1993, she received a raise of 5%, to $2212 per month. In January 1994, she received a raise of 3.8%, to $2296 per month. As of January 1994, Washington's salary was $1 over the minimum of the applicable salary range.

Prior to being notified of her January 1, 1994 raise, Washington complained to her supervisor, Brenda Lewis, that she had not been promoted. Several days later, Lewis told Washington that she had spoken with McKnight about Washington and that, if Washington wanted a promotion, McKnight would push for it. In connection with the budgeting process for the upcoming fiscal year, McKnight budgeted Washington for a promotion to Senior Property Accountant effective June 1, 1994.

On February 21, 1994, Washington filed an EEOC charge complaining about her level of compensation and her failure to be promoted. After receiving Washington's EEOC charge, JWR accelerated Washington's promotion to March 16, 1994. As a result of her promotion, Washington received a 10.9% raise, to a salary of $2546 per month.

In May 1994, the JWR Supervisor of Payroll and Sales Accounting ("SPSA") position became vacant. That position, a grade 6, was directly supervised by Larry Thornton, the Manager

3

of Cost Accounting. Thornton and Greg Dean, the Vice-President of Finance/Controller, were responsible for filling the SPSA position. Washington and another JWR employee, Emil Turner ("Turner") were considered for the position. Turner's then-current position, Accounts Payable Supervisor, was a grade 5 position. Washington's then-current position, Senior Property Accountant, was a grade 4 position. Turner did not possess a degree in accounting, but he had worked for 16 years at JWR (in comparison to Washington's 8 years), he had served in a supervisory capacity as the Accounts Payable Supervisor for nearly 10 years, and he had substantial prior experience in payroll functions. Turner was selected for the vacant SPSA position and Washington was promoted to Turner's former position, Accounts Payable Supervisor.

As a result of her promotion, Washington received a 12% raise, to $2852 per month. On December 1, 1994, she received a 4.5% raise, to $2980 per month. On June 1, 1995, she received a 4% raise, to $3099 per month.

On July 3, 1995, Washington filed this action, alleging that race discrimination has adversely affected her compensation and foreclosed promotions. On December 1, 1995, she received a 4% raise, to $3223 per month.

JWR's contract with its largest coal customer, the Alabama Power Company ("Alabama Power"), will expire in 1999. At that time, JWR may not be awarded a new coal contract with Alabama Power, or the price per ton charged to Alabama Power may be lower, resulting in reduced profits for JWR. With the goal of increasing its competitiveness in the coal market, in the third quarter of 1995 JWR hired a consulting company, Holley International, Inc. ("Holley"), to analyze and provide recommendations concerning JWR's operations. Since then, Holley has continued to provide recommendations concerning various JWR operations, including the Central

Mining Office.

One Holley recommendation suggested that JWR reduce its salaried workforce by 15% to 20%. Most of these reductions-in-force were accomplished through attrition and an early retirement program offered by JWR in the first quarter of 1997. Between the third quarter of 1995 and the end of 1996, the number of Accounting Department employees fell from approximately 20 to approximately 14.

When Holley was preparing to evaluate the Accounting Department, JWR Vice-President of Finance Greg Dean informed Holley consultants Steve Peacock ("Peacock") and Martyn Walker ("Walker") of Washington's pending employment discrimination lawsuit.[5] Dean requested that Holley not treat Washington any better or any worse than the other employees in the department.

Peacock met with the employees in the Accounting Department and asked each employee to make a list of job tasks. Thereafter, using the data obtained during his discussions with the employees, Peacock prepared a "Manload Analysis" of the department. That analysis estimated the total number of hours per month required to perform each task in the Accounting Department. Peacock's analysis indicated that Washington's position, Accounts Payable Supervisor, required the fewest hours per month: 78.66 hours out of a total of 173.32 available per month.

In January 1997, Holley recommended that two additional positions in the Accounting Department, Carol Calhoun's position as General Accountant I and Washington's position as Accounts Payable Supervisor, be eliminated. Dean decided to terminate Washington and Calhoun. When he informed Washington and Calhoun of the elimination of their positions, he

---

5. Peacock was the consultant who would be interviewing Accounting Department employees, while Walker was the Holley employee who was overseeing Holley's analysis of the department.

5

told them that his decision was based upon the Holley recommendations and upon his own assessment of the needs of the Accounting Department. Washington was terminated on March 27, 1997.

At deposition, Washington did not refer to any employees who should have been laid off in her place; rather, Washington expressed a belief that no Accounting Department employee should have been laid off.

In April 1997 the court permitted Washington to amend her complaint to add a claim of retaliatory discharge.

## Analysis

### I. Time Limits

One of the prerequisites to filing a lawsuit under Title VII is the filing of a charge of discrimination with the EEOC within 180 days of the alleged discriminatory act. 42 U.S.C. § 2000(e)(5)(e). Washington filed her initial EEOC charge alleging race discrimination on February 24, 1994. Therefore, except to the extent that JWR's actions may be interpreted to constitute "continuing violations," Washington may not pursue Title VII claims based upon racially discriminatory acts that occurred prior to August 28, 1993.

The statute of limitations under § 1981 is two years. *Larkin v. Pullman-Standard Div.*, 854 F.2d 1549, 1567 (11th Cir. 1988). Washington filed her complaint on July 3, 1995. Therefore, except to the extent that JWR's actions may be interpreted to constitute "continuing violations," Washington may not pursue § 1981 claims based upon racially discriminatory acts that occurred prior to July 3, 1993.

II. Compensation

One of the most interesting and troubling aspects of this action, in the court's view, is the applicability of the doctrine of "continuing violation" to Washington's claim of race-based discrimination in compensation. The key question is this: if Washington was hired in 1987 at a rate lower than that of similarly situated white employees, but her subsequent raises were *not* discriminatory, then could Washington, in February 1994, make a timely claim of compensation discrimination? Two interpretations of these facts are possible.[6]

Under the first interpretation, one would concentrate on the *employer's actions* in determining whether a continuing violation was present. One would conclude that the only discriminatory *act* occurred at the time of hiring, and that no evidence existed of any subsequent discriminatory actions extending into the statutory period, such that there would be no continuing violation. Under this interpretation, Washington's claim would be time barred.

Under the second interpretation, one would concentrate on the *discriminatory effects* in determining whether a continuing violation existed. Although the initial discriminatory hiring decision would be outside the 180-day statutory period, one would interpret all post-hire decisions by the employer as *perpetuating* the discrimination. Thus, even if, after hiring the employee at a discriminatorily low initial salary, the employer proceeded to award that employee *larger* raises than all similarly situated nonminority employees, the plaintiff would be entitled to allege a "continuing violation" so long as her salary was still, at the commencement of the statutory period,

---

6. The court notes that its difficulty in grappling with this issue does not suggest that summary judgment as to Washington's compensation claim is necessarily due to be denied. The court is satisfied that the *facts* pertinent to this question are largely undisputed. The question to be decided — whether a plaintiff alleging these facts may make a "continuing violation" claim — is an issue of law.

7

lower than that of similarly situated nonminority employees. Under this interpretation, Washington's compensation claim would be timely — regardless of the remoteness of her hire date — so long as she could show that, as of July 1993, her salary was still lower than that of similarly situated white employees.

The Fifth and Eleventh Circuits have long grappled with the proper application of the "continuing violation" exception to the Title VII's 180-day filing requirement.

> A past act of discrimination for which a party did not file a charge of discrimination with the EEOC within the limitations period is legally equivalent to a discriminatory act that occurred before the enactment of Title VII. *Although such a past discriminatory act may continue to [a]ffect an employee's present pay and fringe benefits, such an effect does not constitute a continuing violation of Title VII.* "[T]he emphasis should not be placed on mere continuity; the critical question is whether any present violation exists." . . .
>
> [W]here the employer engaged in a discreet act of discrimination more than 180 days prior to the filing of a charge with the EEOC by the employee, *allegations that the discriminatory act continues to adversely affect the employee* or that the employer refuses to rectify its past violation will not satisfy the requirement . . . that the plaintiff file [her] charge of discrimination within 180 days of the discriminatory act.

*Gonzales v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 249 (5th Cir. 1980) (emphasis added) (quoting *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)). On the other hand,

> [w]here an employee charges an employer with continuously maintaining an illegal employment practice, [the employee] may file a valid charge of discrimination based upon that illegal practice until 180 days after the *last occurrence of an instance of that practice.*

*Id.* In *Gonzales*, a Firestone employee challenged Firestone's use of unvalidated aptitude tests in determining promotion and transfer of Firestone employees. Gonzales argued that the tests tended to have a disparate impact on Spanish-surnamed employees, and that Firestone's use of the tests

8

had resulted in his being passed over for transfers in August and October 1972. However, Gonzales did not file a charge with the EEOC until September 1973. Moreover, during its investigation, the EEOC concluded that Firestone had, by October 1971, ceased using the aptitude tests as one of the factors in hiring, promotion, training, and transfer; although Firestone continued to administer the tests, they were intended to be used only as part of a validation study. *Id.* at 243. After the district court ruled that claims relating to the testing system were time-barred, the appellate court remanded the action, concluding that the record on appeal was insufficient to permit an appellate determination as to the viability of Gonzales's continuing violation claim. However, in remanding the case, the court of appeals provided some guidance to the district court:

> If Firestone ceased to utilize such a testing system more than 180 days prior to the filing of Gonzales's charge with the EEOC, then his Title VII complaint would be barred for failure to [file a charge within the appropriate period] unless he could show either [1] that Firestone's continuing to administer the tests for the purpose of the validation study had a disparate effect upon the ability of Spanish-surnamed employees to obtain job opportunities or [2] that Firestone denied him a promotion or transfer within the 180-day period on the basis of the prior testing. A failure to promote Gonzales more than 180 days prior to the filing of his charge based on his prior test scores would not constitute a continuing violation.

*Id.* at 249-50. The *Gonzales* court appears to have adopted the "discriminatory act" interpretation discussed above; that is, unless Gonzales could show that Firestone either 1) had performed a discriminatory act by using the aptitude tests *during the statutory period* or 2) had performed a discriminatory act by denying Gonzales a promotion or transfer *during the statutory period*, then his claim regarding Firestone's use of the aptitude tests would be time barred.

In *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792 (11th Cir. 1992), the Eleventh Circuit elaborated upon the continuing violation standards set by the *Gonzales* court. In *Beavers*,

a divorced male ACIPCO employee challenged his employer's policy relating to payment of medical and dental benefits for employees' dependents. ACIPCO's policy, adopted in 1962, provided that such benefits would be provided only to dependents who resided full time with the ACIPCO parent. Beavers alleged that this policy had a disparate impact upon divorced male employees, who were much less likely than divorced female employees to be granted custody. *Id.* at 794. Although Beavers became subject to this policy in 1975, he did not file an EEOC charge until 1983. *Id.* at 795. On appeal, the Eleventh Circuit concluded that Beavers's claim was timely, since ACIPCO's policy, if discriminatory, constituted a continuing violation. *Id.* at 797-98. The court explained that

> the lack of coverage is not . . . merely the residual effect of a single discriminatory act occurring in 1962, 1975, or some other discreet point in time. Rather, it is the direct result of on-going policy actively maintained by ACIPCO.

*Id.* at 798. The *Beavers* court concluded that "Beavers's EEOC charge was timely as to any application of the policy within the preceding 180 days." *Id.*[7]

One year later, the Eleventh Circuit again addressed the continuing violation issue. In *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 650-51 (11th Cir. 1993), a class of employees challenged their employer's use of a career planning process — the "Pay and Progression System" — to determine each employee's wage based upon individualized factors. The district court found that each employee's career plan under the System was "an essential ingredient in establishing [an

---

7. In the court's view, this statement by the *Beavers* court establishes that, even where a plaintiff may succeed in alleging a continuing violation, relief may be granted only to the extent of the damages sustained by the plaintiff *during* the statutory period. In this case, assuming that the court found JWR's conduct to constitute a continuing violation, Washington would be permitted to recover damages only for the discriminatory effects that occurred *after* July 2, 1993. She would not be permitted to recover damages for any alleged discriminatory compensation from October 1987 through July 2, 1993.

employee's] pay curve," and that an employee's pay curve,

> "once established, was the basis for his entire pay history at Buckeye, and was a chief result of the fundamental elements of the Pay and Progression System[,] which left a great deal of responsibility with the subjective decisions of the managers."

*Id.* at 652 (quoting *Ross v. Buckeye Cellulose Corp.*, 733 F. Supp. 344, 347-48 (M.D. Ga. 1989)). Although the Pay and Progression System was implemented prior to 1982, Buckeye froze the system from October 1984 to 1987, when a revised system went into effect. The *Ross* plaintiffs filed their EEOC charges in 1985; during the 180 days prior to filing of the charges, no changes in the Pay and Progression System occurred. *Id.* Reviewing the district court's grant of summary judgment to Buckeye and applying the standards set forth in *Gonzales* and *Beavers*, the *Ross* court concluded that any claims of discrimination relating to Buckeye's use of the Pay and Progression System were time barred. *Id.* at 658. The court noted that the employees had "identified no discriminatory acts which occurred during the limitations period." *Id.* at 659 n.17. The court contrasted ACIPCO's benefits policy, which was an "ongoing policy actively maintained by the company" with Buckeye's career program, in which the program freeze was more accurately considered as a "neutral act that the relevant precedent has indicated is not a continuing violation, but [was] a mere continuing effect." *Id.* at 659-60. In addition, the court noted that, under *Gonzales,* the mere fact that an employee's pay continued to be out of line with that of other employees did not itself create a continuing violation; "a failure to promote Gonzales more than 180 days before the EEOC charge was not a continuing violation, *notwithstanding the obvious fact that the failure to promote had continuing consequences for employee pay." Id.* at 659.

Only three months later, the Eleventh Circuit again addressed the continuing violation

theory, in *Calloway v. Partners National Health Plans*, 986 F.2d 446 (11th Cir. 1993). In *Calloway*, a black female former Partners employee brought a Title VII wage discrimination action against her former employer, relying upon an EEOC charge filed by another black female employee, Steward. Calloway had been hired by Partners as a secretary in June 1987 at an annual salary of $14,996, replacing a white female secretary who had been hired nine months earlier at an annual salary of $16,000. Based on the filing date of Steward's EEOC charge, Calloway's wage discrimination claim could only be considered timely if the alleged discrimination occurred after August 18, 1987. *Id.* at 447-48. The district court granted summary judgment in favor of Partners, finding that any wage claim by Calloway was time barred, since any discrimination in wages was a direct result of a single discriminatory act, Partners's hiring of Calloway in June 1987, two months outside the statutory period. *Id.* at 448. The Eleventh Circuit reversed, citing *Bazemore v. Friday*, 478 U.S. 385, 395 (1986) ("Each week's paycheck that delivers less to a black man than to a similarly situated white is a wrong actionable under Title VII . . . "). The court found the district judge's finding of a "single discriminatory act" to be clear error. "Partners discriminated against Calloway not only on the day that it offered her less than her white predecessor, but also *on every day of her employment*." 986 F.2d at 448 (emphasis added). The *Calloway* court concluded that, "[w]hen the claim is one for discriminatory wages, the violation exists every single day the employee works." *Id.* at 449.

This court has reviewed the *Gonzales, Beavers, Ross,* and *Calloway* decisions in considerable depth, and concludes that the decisions are in direct conflict. Specifically, the court concludes that the *Calloway* court — although referencing the earlier Eleventh Circuit decisions construing the continuing violation theory — utterly contradicted the continuing violation standards

established in *Gonzales, Beavers,* and *Ross,* but without overruling those decisions. This court cannot follow both *Gonzales* ("Although . . . a past discriminatory act may continue to [a]ffect an employee's present pay and fringe benefits, it does not constitute a continuing violation of Title VII," 610 F.2d at 249) and *Calloway* ("Partners discriminated against Calloway not only on the day that it offered her less than her white predecessor, but also on every day of her employment," 986 F.2D at 449). For the reasons stated below, this court chooses to follow the traditional approach to the continuing violation theory, as established in *Gonzales, Beavers,* and *Ross*.

In this case, Washington argues that, because she was compensated less than similarly situated white employees beginning in October 1987 and continuing through January 1994, she may bring a timely Title VII claim challenging her rate of compensation for the entire six-year period. While the court recognizes that such a claim might logically follow from the Eleventh Circuit's language in *Calloway,* this court cannot, in the exercise of good sense, interpret *Calloway* as permitting a wage claim utterly unfettered by the 180-day statutory period applicable to all other claims under Title VII. Plaintiff's reading of *Gonzales* and *Calloway* would permit a plaintiff to bring a compensation claim *at any time,* based upon *any prior acts of a employer,* so long as the plaintiff was still, 180 days prior to making an EEOC charge, receiving a lower rate of pay than comparable non-minority employees. Were the court to adopt plaintiff's interpretation of the "continuing violation" exception to the 180-day filing rule, the exception would in fact swallow the rule.[8] Instead, this court, following *Gonzales, Beavers* and *Ross,* concludes that,

---

8. An example illustrates the impracticality of plaintiff's theory. Two employees, one black and one white, are hired into the same job position in 1968. The black employee receives a starting salary of $1600 per month, while the white employee receives a starting salary of $2000 per month. Both employees continue to work in the same position for twenty years, and neither employee receives an increase in compensation. In 1998, the black employee files an EEOC charge, alleging racial discrimination in compensation. According to Washington's interpretation, the

where the discrimination in compensation *began* more than 180 days prior to the filing of an EEOC charge, a plaintiff may pursue a compensation claim only on the basis of specific discriminatory acts or policies enforced by the employer during the 180 days prior to the filing of her EEOC charge. Accordingly, in pursuing her compensation claim, Washington may challenge only actions taken or policies enforced by JWR after July 2, 1993.

A plaintiff making a compensation claim under Title VII must first establish a prima facie case of discrimination. When the evidence of discrimination is circumstantial, the plaintiff "make[s] a Title VII prima facie case [by] showing that she is [black] and her job was substantially similar to higher paying jobs occupied by [whites]." *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 598 (11th Cir. 1994). "If [a plaintiff] fails to identify similarly situated, nonminority employees who were treated more favorably, her case must fail because the burden is on her to establish her prima facie case." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998). Title VII permits a plaintiff to show "substantial similarity" under a more relaxed standard than that used in cases under the Equal Pay Act, but a Title VII plaintiff also must prove intentional discrimination. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992).

This court concludes that Washington has failed to make a prima facie case of racial discrimination in compensation. In her opposition to JWR's motion for summary judgment, Washington lists four alleged "comparators" who were paid more than Washington, in spite of the fact that they were categorized by JWR as "grade 2" employees. However, it appears that none

---

black employee would be permitted, under the "continuing violation" theory, to challenge the employer's 1968 hiring decision, which was made more than 19 years prior to filing of an EEOC charge.

of the four purported comparators was in fact situated similarly to Washington during the period in which Washington may make a compensation claim.[9/] In addition, it appears that Carol Calhoun and Susan Watkins, the other grade 2 accounting employees during the July 1993 to March 1994 period, were always paid *less* than Washington. Because Washington has failed to identify any similarly situated white JWR employee who was better compensated by the employer during the appropriate time period, summary judgment is due to be granted in favor of JWR as to Washington's compensation claim.

### III. Failure to Promote

A plaintiff may establish a prima facie case of discrimination in promotion by presenting evidence that 1) she is a member of a protected minority; 2) she was qualified for and applied for the promotion; 3) she was rejected despite those qualifications; and 4) other equally or less qualified employees who were not members of the protected minority were promoted. *Batey v. Stone*, 24 F.3d 1330, 1334 n.11 (11th Cir. 1994); *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988). Where a plaintiff fails to establish that her employer promoted an equally or less qualified employee, she fails to prove a prima facie case. *See Wu*, 847 F.2d at 1484.

---

9. Comparator #1, Randy Bevis, had already been promoted to the position of Senior Cost Accountant — a position two grades higher than Washington's — by July 1993. Comparator #2, Charles Blevins, had obtained an MBA and had worked for four years as a cost accounting supervisor prior to his employment by JWR; as of 1993, Blevins would have had three years' more accounting experience than Washington. Comparator #3, Brenda Holman, left JWR in June 1993, prior to the period during which Washington may make a viable compensation claim. Comparator #4, Robert Wood, began working at JWR in a grade 6 supervisory position in 1986, more than a year before Washington became a regular JWR employee. After suffering a heart attack in April 1989, he was transferred to the Central Mining Office and demoted to a grade 2 cost accountant for health reasons. Although plaintiff suggests that "Wood is [a] comparator because like Washington he had an absence due to health reasons," nothing submitted by Washington suggests that her injury in an automobile accident in March 1990 resulted in a permanent health condition comparable to Wood's. To the extent that Washington also attempts to identify a "Comparator Group #5" consisting of supervisory employees Greg Dean, Ed McKnight, Brent Street and Larry Thornton, it is clear that her effort must fail; all four were executive-level employees at JWR, and Washington has provided the court with no plausible basis for concluding that they should be considered as comparators.

Here, the same prerequisites that narrow the time period in which Washington may make a compensation claim also limit the period for which she may make a promotion claim. As discussed above in section II with reference to compensation, only promotion claims arising after July 2, 1993, are timely. Accordingly, Washington's only viable promotion claim relates to JWR's selection of white male Emil Turner for promotion to the position of Payroll and Sales Accounting Supervisor in May 1994.

The court concludes that Washington has failed to prove a prima facie case of race discrimination in promotion. Specifically, she has failed to provide the court with any reasonable grounds for concluding either 1) that she would have been qualified for the position of Supervisor of Payroll and Sales Accounting, or 2) that she was at least as qualified as Turner for the new position. None of the materials submitted to the court establishes that Washington had any significant experience in payroll functions at the time that she applied for the SPSA position. At the time of her application for the grade 6 SPSA position, Washington was in a grade 4 position.[10/] She had been an employee of JWR for approximately eight years and had a total of eight years of work experience. In contrast, Turner had substantial experience with payroll functions, nearly 10 years of supervisory experience as Accounts Payable Supervisor, and 16 years of accounting experience at JWR. Based upon the court's review of Washington's deposition, it appears that she testified not that she was *as* qualified as Turner for the SPSA position, but simply that she was sufficiently qualified to perform that job. Under these circumstances, the court concludes that Washington has failed to bear her burden of proving a prima facie case of discrimination in

---

10. Indeed, as of May 1994, Washington had only been in a grade 4 position, Senior Property Accountant, for a month and a half, having been promoted from the grade 2 position of Property Accountant in March 1994.

16

promotion, such that summary judgment is due to be granted in favor of JWR.

IV. Retaliation

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show 1) that she engaged in protected activity under Title VII; 2) that she was disadvantaged by an action of the employer simultaneously with or subsequent to such participation; and 3) that there is a causal connection between the protected activity and the adverse employment action. *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992).

This court has concluded that Washington has failed to establish a prima facie case of retaliation, since she has failed to establish any causal connection between the filing of her EEOC charge and her subsequent termination. Washington filed her EEOC charge in February 1994; she was terminated more than *three years* later, in March 1997. During those three years, Washington received two promotions, which raised her salary position from grade 2 to grade 5, and received at least five raises.[11] Her monthly salary during the three-year period increased from $2296 at the time of her EEOC charge to at least $3223 at the time of her termination.[12] Under these circumstances, the court concludes that Washington has utterly failed to establish any causal

---

11. According to the materials provided to the court, Washington received a 10.9% raise in March 1994 (in conjunction with her promotion to Senior Cost Accountant), a 12% raise in June 1994 (in connection with her promotion to Accounts Payable Supervisor), a 4.5% raise in December 1994, a 4% raise in June 1995, and a 4% raise in December 1995.

12. $3223 was Washington's monthly salary as of December 1995. The parties have not provided the court with any data relating to Washington's salary in the period between December 1995 and her termination in March 1997.

connection between the filing of an EEOC charge and her termination. Summary judgment is due to be granted in favor of JWR as to Washington's retaliation claim.[13]

Dated: July 31, 1998

Chief Judge Sam C. Pointer, Jr.

Service List:
  Mr. James P. Alexander
  Mr. Arnold W. Umbach, III
  Mr. Lee D. Winston

---

13. As both parties have noted, the Eleventh Circuit has not yet specifically addressed the viability of retaliation claims under § 1981. To the extent that such claims are viable, this court assumes that § 1981 retaliation claims would be addressed according to the framework established for Title VII retaliation claims. Accordingly, the court has concluded that Washington has failed to present a prima facie case of retaliation under either Title VII or § 1981.